*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-AA-42

UNION MARKET NEIGHBORS, PETITIONER,

v.

DISTRICT OF COLUMBIA ZONING COMMISSION, RESPONDENT,

and

FOULGER-PRATT DEVELOPMENT, LLC, INTERVENOR.

Petition for Review of a Decision of the
District of Columbia Zoning Commission
(ZC-28-15)

(Argued February 7, 2018                    Decided December 13, 2018)

*Aristotle Theresa*, with whom *Emily Citkowski* was on the brief, for petitioner.

*Karl A. Racine*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General at the time the brief was filed, and *Loren L. AliKhan*, Deputy Solicitor General at the time the brief was filed, filed a statement in lieu of brief, based on the order under review.

*Philip T. Evans*, with whom *Cynthia A. Gierhart* was on the brief, for intervenor.

Before BLACKBURNE-RIGSBY, *Chief Judge*, FISHER, *Associate Judge*, and STEADMAN, *Senior Judge*.

STEADMAN, *Senior Judge*: A major eleven-story multi-use development has been planned for a one and one-half acre parcel, now devoted to several small commercial uses, in the North of Massachusetts (NoMA) area of the District of Columbia. After a public hearing, the project was approved by the Zoning Commission (Commission) in a lengthy and detailed order that is the subject of this appeal. The only opposition to the project was that of the petitioner Union Market Neighbors (UMN), an association of neighbors in the vicinity of the proposed development. As was permitted by the notice of the hearing, UMN, through a self-designated "expert," filed a statement in opposition to the project, raising various concerns. However, the record before us shows no participation at the hearing itself by any UMN representative, where UMN's request for party status was denied. We have considered the arguments made to us by UMN but conclude, particularly given our deferential standard of review, that no basis has been shown to set aside the Commission's order.

## I.    Facts

On October 30, 2015, intervenor Foulger-Pratt Development, LLC, filed an application with the Commission, seeking approval of a planned unit development

(PUD) that would consist of some 370 residential units, 175 hotel rooms, office space, and ground floor retail on a one and one-half acre parcel, previously devoted to a three-story self-storage facility, a one-story retail building, and a large surface parking lot. Altogether, the proposed project would consist of four integrated buildings, three of which would be approximately eleven stories in height, with a gross floor area of approximately 450,000 square feet. On April 29, 2016, the Commission published notice that a public hearing on the proposed project would be held on June 20, 2016.

On June 6, 2016, petitioner UMN filed a three-page document requesting party status in opposition at the hearing. It stated that UMN was a citizens' association recently formed under the District of Columbia Uniform Unincorporated Nonprofit Association Act of 2010, D.C. Code § 29-1101 *et seq.* (2012 Repl.) and consisting of neighbors living, working, and operating in the area around what is known as Union Market. Separately, UMN submitted a four-page statement by its self-designated expert, Chris Otten, setting forth objections relating specifically to the PUD proposal. This was done pursuant to the notice of

hearing, which provided that "written statements, in lieu of personal appearance or oral presentation, may be submitted for inclusion in the record."[1]

Near the outset of the June 20, 2016 hearing, the Commission briefly addressed UMN's request for party status, although the chairman noted after inquiry that no one from UMN was then present at the hearing. The Commission concluded that the request had failed to adequately show how UMN was more distinctly or uniquely affected by the project than other persons in the general public.

Two other mentions of UMN were made in the course of the two and one-half hour hearing. One was a question to the representative of the local Advisory Neighborhood Commission (ANC) whether he had heard of UMN. He had not until very recently, and no one from such a group had been identified at meetings of the ANC. He did understand that UMN had filed or would be filing opposition to other PUDs in the area. The second mention was at the point when the chair

---

[1] Although neither the notice of hearing nor UMN's submitted statements were included in the original appendix filed in this appeal, both were included in the official agency record on appeal. Following oral argument, UMN filed a motion which, in part, sought to add these two items to the appendix. The motion being unopposed in that regard, we grant the request. But see note 4, *infra.*

asked whether there were any organizations or persons to speak in opposition. The chair noted: "We did have on the list Mr. Robert Hayford [sic][2] and Mr. Chris Otten. I believe they have left but they were in opposition." The chair also noted that although Mr. Otten was noted in the record as an expert witness, he had not been given expert status by the Commission and that status was denied. No objection from the audience was recorded as having been made to these comments.

No oral testimony in direct opposition to the project was presented at the hearing. A number of specific suggestions for relatively minor modifications were made by the zoning commissioners and by the representative of the local ANC. Several subsequent filings were made in response to those suggestions. Finally, on September 12, 2016, the Commission unanimously approved the application subject to certain conditions. UMN timely filed a petition with us for review of that order.[3]

---

[2] A Mr. Robert Haferd was identified in the filed documents as a "co-facilitator" of UMN and as authorized to represent the UMN in the case.

[3] The intervenor has challenged UMN's standing to file the appeal. Under the D.C. Administrative Procedure Act, D.C. Code § 2-510 (a) (2012 Repl.), any person "adversely affected or aggrieved[] by an order or decision of . . . an agency in a contested case[] is entitled to judicial review thereof. . . ." Although Congress did not establish our court under Article III of the Constitution, we generally apply the constitutional case or controversy requirement and the prudential standing prerequisites. *Friends of Tilden Park, Inc. v. District of Columbia*, 806 A.2d 1201,

(continued…)

## II. Standard of Review

At the outset, we reiterate the limited role that this court plays in reviewing orders and decisions of the Commission. It is decidedly not this court's role to "reassess the merits of the decision." *Washington Canoe Club v. District of Columbia Zoning Comm'n*, 889 A.2d 995, 998 (D.C. 2005). Our focus is strictly

---

(…continued)
1206 (D.C. 2002) (internal citation omitted). Organizational standing exists where its members would have standing in their own right. *See D.C. Library Renaissance Project/West End Library Advisory Grp. v. District of Columbia Zoning Comm'n*, 73 A.3d 107, 113 (D.C. 2013). Similarly, we recognized standing in *Dupont Circle Citizens Ass'n v. Barry*, 455 A.2d 417, 421-22 (D.C. 1983), where the association cited their injury in fact to include "preserving the integrity of the historical neighborhood." *See also West End Library*, 73 A.3d at 114 (discussing cases where standing was recognized). Intervenor points to *York Apartments Tenants Ass'n v. District of Columbia Zoning Comm'n*, 856 A.2d 1079 (D.C. 2004), but there we denied standing mainly because the petitioner's claims "amount[ed] to nothing more than an allegation of the right to have the Zoning Commission act in accordance with its rules and regulations." Such generalized grievances were "not personal to the petitioner." *Id*. at 1084. Moreover, the classroom/dormitory structure proposed in that case, *id.* at 1085, contrasts markedly with the sheer size and bulk of the extensive project being proposed here. Of the seven forms submitted to support the UMN application for party status, six came from persons living on 5th Street, N.E., within a block and a half east of the project in a residential area zoned R-3 and consisting mainly of modest dwellings. In light of the circumstances here, including the arguments supporting UMN's application for party status and the affidavits submitted in support of standing delineating the proposed project's impact on UMN members, we are satisfied that UMN can challenge the Commission's order in this case. Intervenor's motion to dismiss on the grounds of standing is denied.

on the law as it applies to the matter under review. By statute, as relevant here, we may hold unlawful and set aside an agency action in a contested case only where it is found to be "[a]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "[w]ithout observance of procedure required by law," or "[u]nsupported by substantial evidence in the record of the proceedings before the Court." D.C. Code § 2-510 (a)(3)(A), (D), (E) (2012 Repl.).[4] Furthermore, while determinations of law are the ultimate responsibility of this court, we recognize the Commission's "statutory role and subject-matter expertise [and] generally defer to the Commission's interpretation of the zoning regulations," *Howell v. District of Columbia Zoning Comm'n*, 97 A.3d 579, 581 (D.C. 2014) (quoting *Durant v. District of Columbia Zoning Comm'n*, 65 A.3d 1161, 1166-67 (D.C. 2013)). More broadly, "we will accord deference to an agency's interpretation of the statute which it is responsible for administering if it is reasonable and not plainly wrong or inconsistent with its legislative purpose. When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order." *Wisconsin-Newark Neighborhood Coal. v. District of Columbia Zoning Comm'n*, 33 A.3d 382, 388-89 (D.C. 2011) (internal citations and

---

[4] Our review is statutorily limited to the "exclusive record for decision before the . . . agency." D.C. Code § 2-510 (a) (2012 Repl.); *accord Murchison v. District of Columbia Dep't of Pub. Works*, 813 A.2d 203, 205 (D.C. 2002). UMN's pending motion, which in part seeks to supplement the official agency record before us with a new affidavit, must therefore be denied in that regard.

quotations omitted). Likewise, with respect to the evidentiary record, "we must affirm the Commission's decision so long as (1) it has made findings of fact on each material contested issue; (2) there is substantial evidence in the record to support each finding; and (3) its conclusions of law follow rationally from those findings." *Durant*, 65 A.3d at 1167.

Moreover, we "'start from the premise that the agency's decision, like the decision of a trial court, is presumed to be correct, so that the burden of demonstrating error is on the appellant or petitioner who challenges the decision.'" *Johnson v. District of Columbia Office of Emp. Appeals*, 912 A.2d 1181, 1184 (D.C. 2006) (quoting *Hoage v. Board of Trs. of the Univ. of the District of Columbia*, 714 A.2d 776, 781 (D.C. 1998)). With these principles in mind, we turn to the legal arguments made to us by UMN.

## III. Analysis

In its opening brief to this court, UMN in its "Statement of Issues Presented for Review" sets forth two separate issues that it submits to us.[5] We address each in turn.[6]

**A.**

The first issue UMN identifies as follows: "Is the Commission required to evaluate predictable adverse effects before making decisions on PUD applications?" As we understand it, the overarching assertion is that the Commission ignored or inadequately took into account the adverse effects that the project would have on the immediately adjoining neighborhoods, especially to the

---

[5] In the final portion of its brief, UMN challenges the Commission's failure to grant it party status. Its petition appears to have failed to satisfy a number of the requirements for a party status motion under 11 DCMR § 3022.3. But we need not determine whether UMN was entitled to party status because, by its failure to appear at the hearing to support its application, it necessarily was in no position to exercise the most significant right of party status; viz.: to cross-examine witnesses. 11 DCMR §§ 3022.3, 3119.3. Indeed, under the current zoning regulation on party status, UMN's failure to appear would "be deemed to constitute the withdrawal of the party status request." 11-Z DCMR § 404.11 (2016). After the date of the hearing, the District's zoning regulations were amended and became effective on Sept. 6, 2016. 63 D.C. Reg. 10932, 10933 (2016). (All references in this opinion to the provisions of the DCMR relating to the Commission are to the version in effect at the time of the hearing.) In any event, the only relief that UMN seeks is that "if the Zoning Commission Order No. 15-28 is remanded, UMN must be granted party status in any future proceeding." No remand is occurring here.

[6] We only address the issues and arguments made in the opening brief. "It is the longstanding policy of this court not to consider arguments raised for the first time in a reply brief." *Stockard v. Moss*, 706 A.2d 561, 566 (D.C. 1997).

south and east. To approve a PUD, the Commission must, among other requirements, find that "the impact of the project on the surrounding area and the operation of city services and facilities shall not be found to be unacceptable, but shall instead be found to be either favorable, capable of being mitigated, or acceptable given the quality of public benefits in the project," 11 DCMR § 2403.3 and must "judge, balance, and reconcile the relative value of the project amenities and public benefits offered, the degree of development incentives requested, and any potential adverse effects according to the specific circumstances of the case." 11 DCMR § 2403.8.

Contrary to UMN's assertions, the order of the Commission is replete with evidence that the Commission took into account the neighborhood impact of what it recognized as a major "redevelopment of an underutilized parcel." For example, noting a comprehensive transportation review, the Commission concluded that the project "would not have a detrimental impact on the surrounding transportation network," "will not cause unacceptable impacts on vehicles or pedestrian traffic," and would "not create adverse traffic, parking, and pedestrian impacts on the surrounding community." Water and electricity concerns were addressed as DC Water said it has the capacity to serve the project, and Pepco indicated it would likewise provide new service. In response to ANC concerns about how the

southeast corner of the project, including the proposed eleven-story hotel, would interact with 4th Street's lower-scale buildings, the project design was altered to modify the project's impact on the neighborhood, including the nearby school. This softening would involve the installation of a green wall of various textures and hues combined with planting greenery on this south elevation. With respect to housing, the Commission noted that the project increased the housing stock, including that of affordable housing. About 372 residential units would be created with 26,361 square feet specified for affordable units. UMN's claim that the Commission failed to address the neighborhood impact is belied by this record.

In short, we see no legal basis to upset the Commission's conclusions that "[t]he Commission has judged, balanced, and reconciled the relative values of the project amenities and public benefits offered, the degree of development incentives requested, and any potential adverse effects," that "the proposed height and density will not cause an adverse effect on nearby properties, are consistent with the height and density of surrounding and nearby properties, and will create a more appropriate and efficient utilization of a prominent, transit-oriented site," that "the impact of the Project on the surrounding area and the operation of city services will not be unacceptable," and that "the Application will be approved with conditions to

ensure that any potential adverse effects on the surrounding area for the Project will be mitigated."

## B.

The second issue UMN identifies as follows: "Can the Commission amend the DC Zone Map without limitation to permit a project that concentrates wealth in spite of comprehensive plan policies and zoning regulations that seek to build an inclusive city?" While the major tenor of this issue may appear to invoke political and policy issues, we can address the legal arguments presented in UMN's brief.

In approving the project, the Commission rezoned the property from a C-M-1 zone to a C-3-C zone. UMN argues that this rezoning was done in violation of D.C. Code § 6-641.02's (2018 Repl.) provision that "[z]oning maps and regulations, and amendments thereto, shall not be inconsistent with the comprehensive plan for the national capital." That Comprehensive Plan contains a planning map called the Future Land Use Map (FLUM). The FLUM designates the project's site as "mixed-use Medium-Density Commercial/Medium-Density Residential Production, Distribution and Repair," which top out at eight stories in contrast to the project's eleven stories. 10A DCMR § 225.10. UMN notes that

"the FLUM lists a C-3-C zone [allowing higher buildings] among the FLUM's 'High Density' commercial designation list of corresponding zone districts. 10A DCMR § 225.11," and argues that therefore the rezoning ipso facto violates the comprehensive plan.

However, the FLUM is "intended to provide generalized guides for development and conservation decision." The FLUM "is not a zoning map . . . zoning maps are parcel-specific . . . by definition the Map is to be interpreted broadly." 10A DCMR § 226.1 (a); *see Wisconsin-Newark*, 33 A.3d at 396. And the FLUM definitions themselves recognize their flexibility by qualifying their specifications as "generally," and, with respect to zoning categories, state that "other districts may apply." Further, the FLUM "explicitly contemplates" that in appropriate circumstances "the PUD process may permit greater height or density." *Friends of McMillan Park v. District of Columbia Zoning Comm'n*, 149 A.3d 1027, 1034 (D.C. 2016) (citing 10A DCMR § 226.1 (c)).

UMN also raises more general objections to the project, invoking inter alia principles of affordability and concentration of "significant luxury and wealth." It is entirely understandable that settled neighborhoods may be seriously distressed by the impact of major changes. But, as previously noted, these objections appear

to involve policy and political considerations beyond the scope of legal review. "The Comprehensive Plan reflects numerous occasionally competing policies and goals . . . the Commission may balance competing priorities in determining whether a PUD is consistent with the Comprehensive Plan as a whole." *Friends of McMillan Park*, 149 A.3d at 1034 (internal citations omitted).

The Commission here in its order set forth in exhaustive detail the bases for its conclusion that the project was not inconsistent with the Comprehensive Plan. UMN has failed to identify any basis to warrant rejection on legal grounds of this conclusion.

Accordingly, the order of the Zoning Commission must be and is hereby

*Affirmed.*