*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-CV-0884

MAYOR MURIEL BOWSER, *et al.*, APPELLANTS,

V.

DUPONT EAST CIVIC ACTION ASSOCIATION, *et al.*, APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(2019-CA-004130-B)

(Hon. Yvonne Williams, Trial Judge)

————

No. 20-AA-0693

DUPONT EAST CIVIC ACTION ASSOCIATION, *et al.*, PETITIONERS,

V.

D.C. OFFICE OF PLANNING, HISTORIC PRESERVATION OFFICE, MAYOR'S AGENT FOR HISTORIC PRESERVATION, RESPONDENT,

and

PERSEUS TDC, *et al.*, INTERVENORS.

On Petition for Review of an Order of the
District of Columbia Mayor's Agent for Historic Preservation
(2019-HPA-000497)

(Argued April 26, 2023                          Decided August 24, 2023)

*Graham E. Phillips*, Deputy Solicitor General, with whom *Brian L. Schwalb*, Attorney General for the District of Columbia, *Caroline S. Van Zile*, Solicitor General, and *Ashwin P. Phatak*, Principal Deputy Solicitor General, were on the briefs, for appellants.

*Michael D. Hays*, with whom *Barry Coburn* and *Marc Eisenstein* were on the briefs, for appellees.

*Gary M. Ronan*, with whom *Andrew Zimmitti* and *Joel E. Antwi* were on the briefs, for Perseus TDC as *amicus curiae* in support of appellants.

Before EASTERLY and DEAHL, *Associate Judges*, and FISHER, *Senior Judge*.

DEAHL, *Associate Judge*:  These consolidated appeals concern the ongoing construction of an apartment building behind the Scottish Rite Temple—a historic landmark located at 1733 16th Street NW.  The Temple occupies roughly half of a single record lot that spans an entire block and straddles the 14th and 16th Street Historic Districts, and that lot must be subdivided if this project is to proceed.  The developer, Perseus TDC, sought approval for this subdivision from the Mayor's Agent for Historic Preservation, who approved its application over the opposition of several neighbors and neighborhood organizations, including the Dupont East Civic Action Association, or DECAA.  Case No. 20-AA-0693, which we refer to as the subdivision appeal, is DECAA's challenge to the Mayor's Agent's approval of this subdivision.

In addition to opposing Perseus's subdivision application, DECAA filed its own application with the Historic Preservation Review Board, or HPRB, to extend the boundary of the Temple landmark to encompass the entire block, including the land where the apartment building is being constructed. As part of its consideration of this application, the HPRB determined that the landmark's site boundaries had never actually been delineated. Accordingly, in its decision denying DECAA's request, the HPRB "t[ook] the opportunity presented by this application to clarify and confirm" that the boundaries of the Temple landmark are coterminous with the taxation lot occupied by the Temple at the time of its construction and for many decades thereafter—i.e., the western portion of the present-day record lot, outside the footprint of the apartment building project. DECAA filed suit challenging this decision, and the Superior Court ultimately granted its motion for summary judgment after concluding that the HPRB acted arbitrarily and capriciously in defining the Temple landmark's boundaries. Case No. 22-CV-0884, which we refer to as the boundary appeal, is the District's appeal from this judgment.

In both cases, we agree with the District. As to the subdivision appeal, the Mayor's Agent found that subdividing the property was consistent with the purposes of the District's historic preservation statute. Because that finding was supported by substantial evidence in the administrative record, we affirm the Mayor's Agent's

decision. As to the boundary appeal, the HPRB's finding that the Temple landmark's boundaries had never been established and should be set as coterminous with the taxation lot occupied by the Temple at the time of its construction was neither arbitrary nor capricious, and the ruling was supported by substantial evidence. The Superior Court thus erred in vacating the HPRB's decision, and we reverse its order granting summary judgment to DECAA.

## I.

### *The Scottish Rite Temple*

Designed by famed architect John Russell Pope, the Scottish Rite Temple was constructed to serve as the headquarters for the Supreme Council of the Scottish Rite of Freemasonry, 33rd Degree, Southern Jurisdiction. Upon its completion in 1915, the Temple stood on Assessment and Taxation (A&T) Lot 800, which was comprised of record lots 86 through 100,[1] running along the western corner of 16th and S Streets NW. At that time, the Temple was "hemmed in by rowhouses and

---

[1] A record lot is "a lot recorded on the records of the Surveyor of the District of Columbia." 11-B D.C.M.R. § 100.2. For convenience, the owner of multiple adjacent record lots can consolidate them into an A&T lot, which allows for the payment of a single tax bill for the entire parcel. *See* 9 D.C.M.R. § 352.3.

streets," including a public alley that ran between the Temple and an adjacent carriage house, as depicted below:

S St. NW



Map 3: *Baist's Real Estate Atlas of Surveys of Washington, District of Columbia*, Vol. 1, Plan 19 (1919)

Public Alley

In the following decades, the Masons bought up adjacent lots and razed the rowhouses that occupied them. By 1964, they had acquired roughly half of the properties along S Street; the boundaries of A&T Lot 800, however, were not expanded to include these newly acquired record lots.

That same year, Congress established the Joint Committee on Landmarks of the National Capital, "an inter-governmental agency under the sponsorship of the Mayor of the District of Columbia and the two federal agencies, the Commission of Fine Arts and the National Capital Planning Commission." *A&G Ltd. P'ship v. Joint*

*Comm. on Landmarks of Nat'l Cap.*, 449 A.2d 291, 292 & n.4 (D.C. 1982). As one of its first acts, the Joint Committee published *Landmarks of the National Capital: Preliminary List*, a catalog of structures and places of significant historic or aesthetic value. This list included the Temple as a Category III landmark—i.e., a landmark "of value which contribute[s] to the cultural heritage or visual beauty and interest of the District of Columbia and its environs, and which should be preserved, or restored, if practicable." As with all Category III landmarks, the Joint Committee identified the Temple only by reference to its approximate address ("16th & S St., N.W."); its list did not specify precise landmark boundaries for the Temple. As noted, the Temple at that time still sat on A&T Lot 800, the same taxation lot it had occupied since its construction in 1915.

In 1966, shortly after the Joint Committee added the Temple to its preliminary list of District landmarks, Congress passed the National Historic Preservation Act, Pub. L. No. 89-665, 80 Stat. 915 (codified as amended at 54 U.S.C. §§ 300100 *et seq.*). Among its various provisions, this statute authorized grants to states that prepared comprehensive historic preservation plans. *Id.* § 102, 80 Stat. at 916. The District delegated responsibility for preparing its plan to the Joint Committee, *see A&G Ltd.*, 449 A.2d at 292, which in 1973 published an updated list and map of "all the designated landmark buildings, places, and objects which comprise the District

of Columbia's Inventory of Historic Sites." As with its preliminary list, the Joint Committee once again identified landmarks by their approximate addresses without any reference to their precise boundaries. This updated list was then incorporated into the District's statewide preservation plan, which was published the following year.

Meanwhile, the Masons had continued with their property acquisitions, including purchasing the adjacent carriage house and obtaining the closure of the public alley separating it from the Temple. The carriage house was located on its own A&T lot (808), which in 1976 the Masons combined with A&T Lot 800 and their other property holdings along S Street to create A&T Lot 820. This new taxation lot encompassed the property located within the western two-thirds of the block, as depicted below:



The following year, in 1977, the Joint Committee added the "Sixteenth Street Historic District" to the District's inventory of historic sites, defining it to include the buildings on both sides of 16th Street between Scott Circle and Florida Avenue. Unlike its treatment of Category III historic landmarks, the Joint Committee identified this historic district by reference to its specific boundaries, which it set using the rear lot line of every then-existing lot fronting 16th Street along this roughly 14-block span (including, evidently, the boundaries of both record lots and taxation lots). As a result, the historic district included all of A&T Lot 820, including the Masons' new property acquisitions that had been consolidated into this taxation lot the year prior.

Unlike the preliminary 1964 list, inclusion in the Joint Committee's updated catalog of historic sites triggered additional legal protections, including those set forth in the Historic Landmark and Historic District Protection Act, commonly called the Preservation Act, D.C. Code §§ 6-1101 to -1115. That statute placed various restrictions on the alteration, demolition, and subdivision of historic landmarks and other properties within historic districts, defined in reference to the D.C. Inventory of Historic Sites. *Id.* § 6-1102. As of 1979, when the statute took effect, that Inventory included both: (1) the Temple itself, which was listed by address only; and (2) the 16th Street Historic District, defined in relation to property

lines and which included all of A&T Lot 820. The Preservation Act also authorized the creation of the HPRB, which in 1983 assumed the functions of the Joint Committee. *See Donnelly Assocs. v. D.C. Hist. Pres. Rev. Bd.*, 520 A.2d 270, 271 & n.2 (D.C. 1987).

In the following decades, the Masons continued with their property acquisitions, and by the early 1990s they had purchased and razed the last of the rowhouses along 15th Street (the carriage house, however, remains to this day). In 2011, they obtained the closure of the remaining portion of the alley running through the block, and in 2013 they merged all of their holdings to create a new record lot—Lot 108—that spanned the entire width of the block from 15th to 16th Street, and was bounded by S Street to the north, and the alley to the south. The western two-thirds of this lot (i.e., the former A&T Lot 820) remains within the 16th Street Historic District, while the eastern portion was included in the 14th Street Historic District when it was established in 1994.

*Perseus's Subdivision Application*

About five years ago, the Masons decided to construct an apartment building on the eastern half of their property, hoping to use the money from this development to fund renovations to the Scottish Rite Temple. Because they had merged their

property holdings into one record lot, and the District's zoning regulations generally limit record lots to a single principal structure, *see* 11-C D.C.M.R. § 302.2, this plan required subdividing the property. Subdivisions of properties within historic districts must generally be approved by the Mayor's Agent for Historic Preservation. *See Friends of McMillan Park v. D.C. Mayor's Agent for Hist. Pres.*, 207 A.3d 1155, 1161 (D.C. 2019) ("*FOMP II*"). The Mayor's Agent, in turn, refers subdivision applications to the HPRB for its recommendation. D.C. Code § 6-1106(b). The HPRB, with the assistance of the Historic Preservation Office (HPO), advises the Mayor's Agent on an application's "compatibility" with the purposes of the Preservation Act. *Id.* §§ 6-1102(6A), -1103(c)(1). The Mayor's Agent then makes a final determination, which is appealable to this court. *Id.* § 6-1112(b).

Perseus TDC, the developer spearheading the project, submitted a conceptual design of the apartment building to the HPRB for its review. Conceptual design review is an optional (though highly encouraged) process for seeking the HPRB's advice on whether a project will likely comply with the Preservation Act before formally applying for approval. *Id.* § 6-1108(b). The HPO reviewed Perseus's conceptual design, which it noted would require a subdivision, and concluded that it was generally appropriate. Its report described the eastern half of the record lot as "historically unrelated to the [T]emple" and stated that this property was "not part

of the [T]emple landmark and not recognized as contributing to the historic districts in which it is located." Based on this recommendation, the HPRB unanimously approved the conceptual design. The following year, Perseus submitted its final application to subdivide the property essentially along its 1915 border (i.e., the eastern edge of former A&T Lot 800). The HPRB unanimously recommended the application's approval (subject to several minor design tweaks).

Because several neighboring property owners and neighborhood associations, including DECAA, opposed a subdivision of the Temple property, the Mayor's Agent held a hearing on Perseus's application. *See* 10-C D.C.M.R. § 3000.1. At the hearing, both supporters and opponents of the project offered expert witnesses who opined on the subdivision's consistency with the Temple's historic significance. The Mayor's Agent also received various public statements in support of and in opposition to the project. Among these was one from the local Advisory Neighborhood Commission, or ANC, which supported the subdivision and development.

After considering this evidence, the Mayor's Agent issued an order approving Lot 108's subdivision. The Preservation Act authorizes the subdivision of a historic landmark or a lot within a historic district upon a finding that the subdivision is

"necessary in the public interest," which is defined to mean that it is "consistent with the purposes of [the Act]." D.C. Code §§ 6-1106(e), -1102(10). Describing the arguments in favor of approving the subdivision as "straightforward and persuasive," the Mayor's Agent identified four reasons for authorizing the requested subdivision. First, because the eastern half of Lot 108 did not contribute to the Temple's historic significance, severing that property from the Temple would result in no preservation loss. Second, the Mayor's Agent found that the proposed subdivision would produce meaningful historic preservation gains "because it facilitates a ground lease to provide a revenue stream that will finance much-needed restorations to the Temple," a structure of historic significance. Third, the subdivision was compatible with the character of both the 14th and 16th Street Historic Districts, as it would retain the landmark site intact while "mak[ing] two lots more consistent [with] the size of other lots in both historic districts." Fourth, permitting the development of the eastern portion of Lot 108 would improve the character of the neighborhood, because letting it persist as vacant space would be incompatible with the surrounding historic districts. The Mayor's Agent further noted the support of the HPRB, to which he generally gives deference, as well as that of the local ANC, whose views are entitled to "great weight." D.C. Code § 1-309.10. DECAA now challenges this decision in our court.

*DECAA's Landmark Boundary Application*

Several months after the HPRB approved Perseus's conceptual design, DECAA submitted an application to the Board to "amend the existing [Temple] landmark" boundaries. Claiming that the undeveloped land on the eastern side of the lot had "enhanced magical sightlines to the magnificent Temple," the application requested that the landmark's boundaries be extended "to include all of the land behind the Temple"—i.e., the entirety of present-day Lot 108. Because the District's zoning regulations impose significant hurdles for work affecting historic landmarks, *see, e.g.*, 10-C D.C.M.R. § 303.1, defining the Temple landmark's boundaries in this way would have likely derailed construction of the planned apartment building (as was DECAA's avowed goal).

The HPRB referred DECAA's application to the HPO, which in April 2019 issued a report recommending that it be denied. The HPO's report reasoned that "[t]he land that makes up the expanded boundaries has not been shown to have played a significant role in the history or events tied to the temple," and further noted that it was not even acquired by the Masons until well after the Temple's period of historical significance (i.e., the early decades of the 20th century). However, in this report recommending against an expansion of the Temple landmark's boundaries,

the HPO described the landmark's present boundaries as consisting of the former A&T Lot 820 that was first created in 1976. That lot was "approximately 2/3 of present-day Lot 108," and was considerably larger than former A&T Lot 800 (compare the two depictions above), which the Temple sat upon from its 1915 construction through 1976. When this HPO report was issued, DECAA declared victory, telling its supporters that, because these existing landmark boundaries overlapped with the footprint of the proposed apartment building, "Perseus TDC will not be able to build that building they had planned."

The parties differ on exactly what happened next. According to the District, the HPO "continued to study the history of the site" and eventually concluded "that it was 'an error' to have treated Lot 820 as the Temple's existing boundary." Having identified this error, the HPO took the "concededly unusual step" of issuing a new report the following month. Contrary to its April 2019 report, this revised report explained that the Temple landmark's present boundaries were actually undefined, as when the site was originally listed by the Joint Committee, it was merely identified by address. Accordingly, the HPO recommended using DECAA's application as an "opportunity" to "clarify and confirm" the landmark's existing boundaries, which it described as "the extent of the property at the time of the Temple's completion in 1915, which was [A&T] Lot 800"—in other words, the western half (rather than two

thirds) of the present-day record lot, outside the footprint of the proposed apartment building.

DECAA puts a more nefarious spin on things. By its telling, after it became clear that the boundary lines identified in the April 2019 report would disrupt the developer's construction plans, Perseus and its allies began pressing the HPO to change its recommendation. "Kowtow[ing]" to this pressure campaign, the head of the HPO removed the staffer who had prepared the April 2019 report from working on DECAA's application and took the "unprecedented" step of preparing a new report himself.[2] As noted, that revised report recommended setting the Temple landmark's boundaries to correspond with former A&T Lot 800, which DECAA claims was selected not on the basis of a historic evaluation but rather to avoid triggering any additional permitting requirements, thereby paving over a major hurdle to Perseus's project.

This revised report was submitted to the HPRB, which held a public hearing in May 2019. After hearing testimony from many of the project's supporters and

---

[2] At oral argument, the District expressly denied that this staffer had been removed from working on DECAA's application, accurately noting that she testified in favor of the HPO's revised recommendation at the HPRB hearing.

opponents (including a DECAA representative), the Board publicly deliberated and then voted unanimously to adopt the HPO's recommendation, clarifying the Temple landmark's existing boundaries and rejecting DECAA's application to expand them. In its subsequent written report, the HPRB further justified this decision, its reasoning closely tracking that of the HPO.  In a nutshell, it reasoned that the Temple was constructed upon Lot 800 and then situated upon that lot for more than sixty years, both during its period of historical significance and when it was first entered in the preliminary list of *Landmarks of the National Capital* in 1964, so that former Lot 800 demarcated the landmark's relevant boundaries.  Unlike with the subdivision application, the HPRB's decisions regarding an application to amend a historic landmark are final and not subject to review by the Mayor's Agent.  D.C. Code § 6-1103(c)(3); *see* 10-C D.C.M.R. § 400.1 (Mayor's Agent has authority to make the "final determination on the approval or denial of applications for demolition, alteration, new construction, and subdivision subject to the Historic Protection Act," not landmark designation or boundary-line disputes).

That summer, DECAA filed suit in Superior Court challenging the HPRB's boundary decision as procedurally and substantively unlawful under the Preservation Act, D.C. Administrative Procedures Act, and the Constitution's Due Process and Equal Protection Clauses.  The Superior Court initially dismissed this

suit for lack of jurisdiction, but we reversed, concluding that most of DECAA's challenges were in fact justiciable before the Superior Court. *See* Judgment, *Dupont East Civic Action Ass'n v. Bowser*, No. 20-CV-0315, at 2-3 (D.C. Feb. 15, 2022).

On remand, the Superior Court largely sided with DECAA on the merits, granting its motion for summary judgment on the majority of its claims. Substantively, the court concluded that contrary to the HPO's revised report, "there was no ambiguity" that the Temple landmark's boundaries were the same as the 16th Street Historic District's boundaries (i.e., Lot 820), and that any other possibility "belies explanation." As such, the HPRB's conclusions to the contrary were not supported by substantial evidence and were arbitrary and capricious. Procedurally, the court found that even if the HPRB had the authority to modify those existing boundary lines, it was inappropriate to do so in response to DECAA's application, which sought only the expansion of the landmark's boundaries. When adjudicating this application, therefore, "[t]he HPRB only had the authority to expand the boundary or not modify it at all." Finally, on DECAA's constitutional claims, the trial court concluded that the HPRB's action had denied DECAA equal protection of the laws. Specifically, the court found that the Joint Committee had set Lot 820 as the Temple's boundaries when it included that entire plot of land within the 16th Street Historic District in 1977. And the HPRB's "decision to disregard the Joint

Committee's designation" when adjudicating the application was different than its treatment of any other application, and that this differing treatment lacked any rational basis.

Given its legal conclusions, the court issued an injunction that temporarily stopped work on the portions of the apartment building that fell within former A&T Lot 820. The District now appeals this result, with Perseus supporting the District as amicus and seeking dissolution of the trial court's injunction. The day after hearing oral argument in these appeals, we granted Perseus's motion to dissolve the Superior Court's injunction so as to permit work to resume on the relevant portions of Lot 820 (outside of former Lot 800). *See* Order, *Bowser v. Dupont East Civic Action Ass'n*, No. 22-CV-0884 (D.C. April 27, 2023).

## II.

We begin with the District's challenge in the boundary appeal. Our review of the trial court's order is de novo. *U.S. Bank Tr., N.A. v. Omid Land Grp., LLC*, 279 A.3d 374, 377 (D.C. 2022). After conducting an independent review of the record, "[w]e apply the same standard the trial court was required to apply in considering whether the motion for summary judgment should be granted." *Id.* That requires us to assess whether DECAA has carried its burden of establishing that the HPRB's

actions were "arbitrary, capricious, or an abuse of discretion or contrary to law." *In re A.T.*, 10 A.3d 127, 135 (D.C. 2010). Summary judgment is appropriate only if there are no genuine issues of material fact and the movant can show they are entitled to judgment as a matter of law. Super. Ct. Civ. R. 56(a).

The District argues in this appeal that the Superior Court erred by granting summary judgment, as the HPRB decision was not arbitrary or capricious, but instead well-reasoned, backed by substantial evidence, and procedurally proper. We agree. The HPRB's finding that the Temple landmark's boundaries had never been formally set was supported by substantial evidence in the record, and so the court should have deferred to that finding. And because those boundaries were undefined when DECAA submitted its application to amend them, there was nothing arbitrary or procedurally improper about the HPRB using DECAA's application as an opportunity to formally demarcate them. We address each of these points in turn.

**A.**

The crux of the trial court's order was its finding that "the Temple landmark was—and is—defined by the boundaries of what was [A&T] Lot 820." Recall that the HPRB had concluded the opposite, explaining in its decision that when the Temple was added to the Joint Committee's 1964 preliminary list of historic

landmarks in the District, it was identified merely by its name and address. While some properties on that list were later nominated for inclusion on the National Register of Historic Places—a process that required the Joint Committee to identify specific site boundaries—the Temple was not. Accordingly, when the Joint Committee's list was incorporated into the D.C. Inventory of Historic Sites after the passage of the Preservation Act, the Temple landmark's exact boundaries remained undefined. The trial court rejected this finding, reasoning that the landmark's boundaries were made clear when the Joint Committee included all of A&T Lot 820 in the 16th Street Historic District in 1977, and that "it belies explanation what else would have been part of the Historic District except the Temple landmark."

Contrary to the Superior Court's view, we conclude that the HPRB's reasoning was not only rational, but quite persuasive. Historic districts and historic landmarks are distinct entities subject to separate designation procedures, and the fact that all of Lot 820 was included within the 16th Street Historic District— composed of many non-landmarks—says next to nothing about the landmark's appropriate boundaries. The Joint Committee when drawing the boundaries of the 16th Street Historic District simply had no cause to demarcate the Temple's landmark boundaries. *See, e.g.*, 10-C D.C.M.R. § 200.2 ("The [Preservation] Act protects historic landmarks and historic districts differently during the designation

process."). This is why some historic landmarks are located entirely outside of historic districts, and similarly why historic districts often include many properties that are not themselves landmarks. Indeed, as the District points out, the 16th Street Historic District itself cuts straight through the boundaries of another historic landmark (the Carnegie Institution Administration Building), belying any notion that the Joint Committee intended the borders of the district to delineate the boundaries of the landmarks it encompassed. It seems, as the District posits, that the historic district was drawn to include every then-existing lot (both record and taxation) fronting the relevant stretch of 16th Street, including the then-recently formed A&T Lot 820. We see no support for the trial court's apparent view that in drawing the historic district the Joint Committee designated landmark boundaries.

The trial court further erred by apparently giving weight to the fact that "there is no evidence that the Historic District and Temple landmark had different boundaries behind the Temple landmark." There was in fact extensive evidence to that effect. But more importantly, courts "are to presume the validity of agency action," and this is especially true where an agency is "draw[ing] heavily upon its expertise." *Kamit Inst. for Magnificent Achievers v. D.C. Pub. Charter Sch. Bd.*, 55 A.3d 894, 899 (D.C. 2012) (citations omitted); *see also Bradford Nat'l Clearing Corp. v. Sec. & Exch. Comm'n*, 590 F.2d 1085, 1104 (D.C. Cir. 1978) ("[I]n

reviewing the resulting decisions while not sharing that expertise courts typically accord agency conclusions considerable respect."). It was thus DECAA's obligation in this suit to prove that the historic landmark and district in fact shared a boundary, not the District's to prove that they did not. In other words, even if there were a lack of clear evidence on this point, that would cut in favor of deferring to the HPRB's boundary decision, and it would not be a basis for vacating it.

Departing from the trial court's reasoning, DECAA pivots to an argument that the Temple landmark's boundaries are coterminous with A&T Lot 820 because that is the lot the Temple sat upon in 1979, when the District's Historic Preservation Act took effect and created the D.C. Inventory of Historic Sites (which included the Temple). Essentially, it reasons that the Preservation Act defines the term "historic landmark" as including "a building . . . *and its site* . . . [l]isted in the District of Columbia's inventory of historic sites." D.C. Code §-6-1102(6)(B) (emphasis added). And when that statute took effect in 1979—which DECAA maintains is what created the D.C. Inventory—A&T Lot 800 no longer existed, having already been incorporated into the larger Lot 820. Thus, DECAA argues, the only "site" that could have been associated with this landmark at the time of its addition to the D.C. Inventory was A&T Lot 820, which effectively became the Temple landmark's boundaries by operation of law.

We are similarly unpersuaded by DECAA's argument. Even accepting the premise that the Preservation Act requires that landmarks be associated with a specifically defined "site," the record contains no support for DECAA's claim that these sites are necessarily coterminous with the tax lots the landmarks were situated upon when they entered the D.C. Inventory. That is no doubt "commonly" the case and perhaps it is a "reasonable [starting] assumption," as DECAA maintains, but there is no reason to think as a matter of law that it is invariably true. To be sure, in many instances, landmarks sit on the same lot from their construction to the present day, making their present property lines a useful rule-of-thumb when determining the landmark's site boundaries. But in other cases—such as here—property owners may reconfigure their land holdings after a landmark's period of historic significance but before its addition to the D.C. Inventory, enlarging or shrinking them for reasons entirely unrelated to the site's history. This is particularly true when it comes to taxation lots, which are assembled by the property owners purely as a matter of administrative convenience and rarely, if ever, as a reflection of any sort of historical judgment. Relying solely on these newly configured lots to determine a landmark's boundaries would poorly serve the preservation goals at the heart of the Preservation Act, particularly when the statute itself merely refers to a landmark's "site" rather than its "lot."

Moreover, DECAA's argument mistakenly assumes that the D.C. Inventory was created only in 1979, when the Preservation Act took effect. As discussed in Part I, the D.C. Inventory dates back to at least 1973, when it was published as part of the District's first comprehensive historic preservation plan. And even that Inventory had its origins in the 1964 list assembled by the Joint Committee—a body specifically chartered to "[c]ompile and maintain a current inventory of significant landmarks in the District of Columbia." *Latimer v. Joint Comm. on Landmarks of Nat'l Cap.*, 345 A.2d 484, 487 n.16 (D.C. 1975); *see also 900 G St. Assocs. v. Dep't of Hous. & Cmty. Dev.*, 430 A.2d 1387, 1388 (D.C. 1981) (describing a building as having been included in the D.C. Inventory "since the Inventory was first established in 1964"). The Preservation Act did not scrap this existing Inventory wholesale and replace it with a new one. Rather, the statute simply conferred a new legal status to the existing Inventory while shifting its oversight from the Joint Committee to the newly created HPRB. *See* D.C. Code § 6-1103(c).[3] Thus, even if the boundaries of a landmark were coterminous with the lot it sat on at the time of the creation of the

---

[3] DECAA's contrary view seems largely premised on a single sentence in the HPO's final report, which described the Joint Committee's 1964 list as "the predecessor of the current D.C. Inventory of Historic Sites." But as that report went on to explain, the Preservation Act "incorporated the[se] already designated landmarks and districts," bolstering the District's position that the statute did not create the Inventory anew, but rather adopted the Inventory that had already been assembled by the Joint Committee.

D.C. Inventory, that would still be Lot 800 for the Temple landmark—not Lot 820, which was created years later in 1976.

DECAA makes two more arguments in a similar vein, neither of which is persuasive. First, it cites to a draft HPO report and a snippet of testimony from the office's director as evidence that the 16th Street Historic District's boundary "acknowledged by implication that Lot 820 was also the site of the historic landmark designation for the temple." But while DECAA claims this evidence shows an attempt by the District "to disavow its own expert agency's conclusion," neither a draft report nor an (out-of-context) statement by a single official is anything of the sort. Even the HPO's final report—which rejected these preliminary views and was authored by that same official DECAA quotes—did not constitute the final agency action in this case. It was merely a recommendation to the HPRB, which made the ultimate decision to reject DECAA's application and clarify the Temple landmark's existing boundaries.

Next, DECAA points to several pieces of evidence that the HPRB supposedly ignored when concluding that the Temple landmark's boundaries were undefined. These include: a private bill enacted by Congress to exempt the Masons' property holdings (including those outside the Temple's original footprint) from taxation, *see*

Priv. L. No. 92-23, 85 Stat. 842 (1971); the draft HPO report, discussed above; and a 2010 application to close the public alley behind the Temple, which described A&T Lot 820 as the "Main Temple Site." But the first and third of these records have nothing to do with historic preservation, and so we see no error even if the HPRB did fail to consider them. As for the second, we have already explained that the Board was under no obligation to credit the preliminary views of the HPO, particularly when its final report recommended the opposite.

**B.**

Because the HPRB reasonably, and backed by substantial evidence, found that the precise borders of the Temple landmark had never been properly delineated, most of the trial court's remaining objections to its actions fall by the wayside. This was not, as the court reasoned, a "reduc[tion] [in] the boundary line of the Temple landmark." Because that boundary line was never established in the first place, there were no boundaries to reduce. It thus does not matter whether the HPRB had the authority to undertake a boundary "reduction" as part of its adjudication of DECAA's application because it did not do so; and it is irrelevant whether it would have been a violation of DECAA's equal protection rights to reduce the boundaries, as the trial court concluded, because that did not happen. Rather, the question in this

case is whether the HPRB, upon identifying an ambiguity in the Temple landmark's existing border, acted properly when it "t[ook] the opportunity provided by this application" to "clarify and confirm" the boundary of the landmark. We answer that question in the affirmative, and likewise conclude that its identification of former A&T Lot 800 as the existing border was reasonable.

### 1. The HPRB's Actions Were Procedurally Proper.

As the HPRB's regulations explain, an application to amend the designation of an existing historic landmark is evaluated by using "the same procedures" as an application to designate a landmark in the first instance. 10-C D.C.M.R. § 221.4. This means that after "accept[ing] written comments from affected property owners and any other interested persons," *id.* § 213, soliciting a report and recommendation from the HPO, *id.* § 216, and providing appropriate public notice, *id.* § 211, "[t]he Board shall hold a public hearing to receive information and public comments on each application," *id.* § 217.1. At the conclusion of this hearing, "[t]he Board may vote to designate the property, deny or defer the designation, or designate the property with reduced boundaries." *Id.* § 218.4. Once this decision is reached, the HPRB issues "a written decision with respect to the proposed historic landmark,"

and this decision must "identify the property" and, as relevant here, "specify its boundaries." *Id.* § 219.1.

The HPRB's actions were consistent with these procedures. The administrative record shows that in March 2019, DECAA submitted an application to "amend the existing landmark to include all of the land behind the Temple just described." The Board responded to this application by following "the same procedures" as an application for designation: it solicited an HPO report, which recommended disapproving DECAA's application; it accepted public comments, which included a resolution adopted by the local ANC opposing the application; and it conducted the required hearing, at which a DECAA representative presented the group's case. At the end of this hearing, the HPRB voted to deny DECAA's application, a judgment it subsequently reiterated in its written decision. As required by regulation, *see* 10-C D.C.M.R. § 219.1, that written decision also specified the boundaries of the existing Temple landmark, which the HPRB—upon determining that those boundaries had never been formally delineated—voted to clarify as being coterminous with former A&T Lot 800.

While the trial court deemed this process deficient, its only specific finding related to 10-C D.C.M.R. § 218.4, a regulation permitting the HPRB to designate a

landmark property "with reduced boundaries" compared to those identified in the application. This provision, the court found, relates to applications to list landmarks anew and "is not about amendments." But that is contrary to the text of the regulations themselves, which state unambiguously that applications to alter existing landmarks are evaluated using "the same . . . procedures" as applications to newly designate them. *Id.* § 221.4. Thus, even if the HPRB had resolved DECAA's application by reducing the existing boundaries of the Temple site, it appears that still would have been consistent with the agency's procedures. But we need not definitively opine on that question because, in any event, the HPRB did not in fact reduce the landmark's boundaries; it merely established, or clarified, what they were.

Though its reasoning on this point was less clear, the trial court further suggested that the HPRB failed to provide the required notice of its actions, an argument that DECAA presses in this appeal. As we understand the trial court's reasoning, it thought that because the HPRB only noticed a hearing on "Scottish Rite Temple amendment (boundary expansion)," that was the only action the HPRB was permitted to take. As DECAA subsequently put it, "the notice of a 'boundary expansion' does not provide 'reasonable notice' that *the opposite*[, a boundary reduction,] may occur."

This argument fails for multiple reasons. First, "the opposite" did not, in fact, occur. As we have discussed at length, the HPRB's decision simply clarified the Temple landmark's existing (though formally undefined) borders. It is therefore of no moment that the Notice of Public Hearing did not explicitly state that the HPRB might "reduce" the borders of the Temple landmark at its May 2019 meeting; the HPRB did not take that step.

And regardless of how one frames the HPRB's decision, DECAA had actual notice of exactly what the Board was likely to do, so DECAA is poorly positioned to raise this procedural complaint. The record shows that throughout these administrative proceedings, DECAA closely followed the proceedings of the HPO, and it was aware of both the HPO's April 2019 recommendation and the subsequent revisions thereto. As a result, it came to the HPRB's public meeting fully prepared to press its case, where it argued forcefully against the HPO's final recommendation and in support of its application to expand the landmark's site to the entirety of Lot 108. Particularly since the HPRB's decision closely tracked that HPO recommendation, DECAA cannot now claim to have been prejudiced by any deficiencies in the agency's Notice of Public Hearing, and it does not contend to the contrary. This is fatal to its claim of insufficient notice. *See Friends of McMillan Park v. D.C. Zoning Comm'n*, 211 A.3d 139, 145 (D.C. 2019) ("*FOMP III*") (lack

of notice does not warrant reversal where the parties "have not identified concrete prejudice they suffered as a result"). DECAA's contrary argument that any procedural violation is enough to overturn an agency action, regardless of prejudice, is at odds with our case law. *See id.* And while DECAA raises the possibility that "other concerned citizens" may have been prejudiced by the HPRB's notice, no such aggrieved citizen has come forward, and DECAA "cannot rest [its] claim to relief on the legal rights or interests of third parties." *Martin v. Santorini Cap., LLC*, 236 A.3d 386, 393 (D.C. 2020) (citation omitted). Those hypothetical third parties, should they exist, would have to raise their own complaints.

### 2. The HPRB's Decision Was Not Arbitrary or Capricious.

Because the HPRB reasonably concluded that the precise boundaries of the Temple landmark had never been formally demarcated, and because it properly used DECAA's application as an opportunity to clarify those boundaries, the only remaining question is whether its identification of A&T Lot 800 as the reference point for those boundaries was arbitrary and capricious. That is a pretty open-and-shut question: It was not. As the Board's order explained, "[t]he property's significance is in the design and construction of Pope's [T]emple, completed in 1915." At that time, the Temple sat on A&T Lot 800, which constituted the entirety

of the Masons' property holdings. Even sixty years after this period of historic significance, the eastern portions of what is now Lot 108 "had not been formally consolidated with the [T]emple . . . by the creation of an A&T lot"; that did not happen until 1976. Accordingly, there was little reason to treat the new plots of land added to A&T Lot 800 to form A&T Lot 820 in 1976 as being of any historical significance, or as being within the landmark's boundaries. As the HPRB reasoned, "[n]either the ancillary uses nor the design qualities of the rear of the property define or augment the significance of the landmark." Rather, the HPRB clarified that Lot 800 was the site of historic significance and marked "the extent of the site of the landmark."

DECAA again challenges this determination on multiple grounds, but its arguments are similarly unpersuasive. First, it highlights the differences between the HPO's April 2019 report, which identified the Temple landmark's boundaries as Lot 820, and its May 2019 revision thereto, which stated that these boundaries were undefined. Citing to two federal cases, DECAA argues that this "'about-face' without adequate explanation" was arbitrary and capricious. *See Nat'l Coal. Against Misuse of Pesticides v. Thomas*, 809 F.2d 875, 884 (D.C. Cir. 1987); *Prometheus Radio Project v. FCC*, 373 F.3d 372, 390 (3d Cir. 2004). But even assuming the HPO did fail to adequately explain the differences between its two reports, this

argument misapprehends the office's role in the decision-making process. As previously explained, when a party submits an application to designate or amend a historic landmark, the HPO merely supplies a "report and recommendation on the [] application." 10-C D.C.M.R § 216.1. The ultimate decision is then made by the HPRB, which is the only body with the authority to approve or modify a landmark. While the HPRB must itself provide an adequate explanation for departures from its prior decisions, we are aware of no similar administrative law principle that applies to advisory bodies like the HPO, and DECAA likewise points us to none.

DECAA next discusses at length a guidance bulletin published by the U.S. Department of the Interior for use "in delineating the boundaries of historic landmarks and districts." *See* Donna J. Seifert, *National Register Bulletin: Defining Boundaries for National Register Properties* (rev. ed. 1997). That guidance bulletin—which DECAA maintains has been formally adopted by both the HPO and HPRB—recommends using "the legal boundaries of a property as recorded in the current tax map" when listing a new historic landmark. *Id.* at 3. Thus, argues DECAA, the HPRB acted arbitrarily and capriciously by ignoring this guidance and failing to select those "current" boundaries (i.e., A&T Lot 820).

This argument fails for two reasons. First, it once again begins from the mistaken premise that the Temple was designated as a historic landmark only upon the effective date of the District's Preservation Act in 1979, when the Temple sat on Lot 820. As explained in Part II.A, this is incorrect. The Temple has been a designated landmark since at least 1973 (and arguably as early as 1964), well before Lot 820 existed. Second, by its own terms, this guidance bulletin is just that: guidance. It provides no hard-and-fast rules, and "current legal boundaries" is just one factor it identifies as relevant to the decision-making process. Indeed, in the paragraph immediately following the one highlighted by DECAA, the bulletin recommends consulting "the boundaries shown on historic plats or land-ownership maps . . . when the limits of the eligible resource do not correspond with current legal parcels." *Id.* Here, where the HPRB determined that both Lots 820 and 108 were assembled well after the Temple's period of historic significance, it did just that, using the lines of former Lot 800 in determining the landmark's boundaries.

Finally, DECAA contends that the HPRB "kowtow[ed] to a developer," which is not a valid basis for an agency's decision. But the evidence it cites reveals nothing of the sort. While the record shows various emails and phone calls between Perseus and HPO staffers in the aftermath of the April 2019 report, the agency's own regulations permit (and even encourage) this sort of communication. *See* 10-C

D.C.M.R. § 324.1 ("Before consideration by the Board, the staff shall review each case and consult with the applicant as necessary. . . . The applicant should take full advantage of the staff's availability and expertise."). And this argument once again confuses the role of the HPO, which simply advises the HPRB, with that of the HPRB itself—which was the final decision maker, and as to which DECAA identifies no evidence of improper kowtowing.

In sum, because the HPRB's finding that the Temple landmark site had never been formally delineated was supported by substantial evidence, and because its subsequent actions in setting its landmark boundaries—coterminous with the lot it had sat on during its construction and for many decades thereafter—were procedurally and substantively proper, the Superior Court erred in granting DECAA's motion for summary judgment.

## III.

That brings us to DECAA's petition in the subdivision appeal. Our review of decisions by the Mayor's Agent is "limited and narrow." *Friends of McMillan Park v. D.C. Zoning Comm'n*, 149 A.3d 1027, 1039 (D.C. 2016) ("*FOMP I*") (citation omitted). If a decision is supported by substantial evidence in the record, and if its conclusions flow rationally from its factual findings, we will affirm. *Id.* Likewise,

"[w]hen the Mayor's Agent's 'decision is based on an interpretation of the statute and regulations [the Mayor's Agent] administers, that interpretation will be sustained unless shown to be unreasonable or in contravention of the language or legislative history of the statute.'" *Id.* (quoting *Kalorama Heights Ltd. P'Ship v. D.C. Dep't of Consumer & Regul. Affs.*, 655 A.2d 865, 868 (D.C. 1995)).

The Mayor's Agent may authorize the subdivision of a historic landmark, or of property within a historic district, upon a finding that such an action is "necessary in the public interest." D.C. Code § 6-1106(e). "Necessary in the public interest," in the context of Perseus's application, means that it is "consistent with the purposes of [the Preservation Act]." *Id.* § 6-1102(10).[4] With respect to historic landmarks, the Act's stated purposes are to "retain and enhance historic landmarks in the District of Columbia and to encourage their adaptation for current use," as well as to "encourage the restoration of historic landmarks." *Id.* § 6-1101(b)(2). With respect to historic districts, the Act's purposes also include ensuring that subdivisions and

---

[4] The Preservation Act also permits subdivisions when "necessary to allow the construction of a project of special merit," D.C. Code § 6-1102(10), but Perseus has never claimed that the planned apartment building qualifies as a project of special merit or sought approval on that ground.

other alterations "are compatible with the character of the historic district."[5]  *Id.* § 6-1101(b)(1).  As we explained in *FOMP II*, the Mayor's Agent's inquiry into whether a project is consistent with the purposes of the Preservation Act requires a "net" assessment of its effects.  207 A.3d at 1166.  The relevant question is whether "a project on balance benefits historical-preservation interests more than it harms those interests."  *Id.* (quoting *FOMP I*, 149 A.3d at 1041).

In this case, the Mayor's Agent performed just this assessment.  First, it determined that subdividing Lot 108 would result in no historic-preservation losses, as the eastern half of the lot did not contribute to the Temple's historic significance.  Second, it determined that the subdivision would produce meaningful historic-preservation gains by generating revenue that could be used to fund renovations to

---

[5] We are concerned only with the subdivision of property within a historic district, rather than with the subdivision of a landmark site itself, given the HPRB's determination that the landmark's site is the former Lot 800.  We have upheld that determination, so the landmark's site does not need to be subdivided for the project to proceed:  The landmark's boundaries will remain intact and on a single record lot following the subdivision of Lot 108 proposed by Perseus.  Nonetheless, the Mayor's Agent operated under the assumption that any subdivision in this case would need to be consistent not only with the Act's purposes with respect to historic districts, but also with respect to historic landmarks.  *See* D.C. Code § 6-1106(c) (requiring subdivision be "consistent with the purposes of" the Act generally).  The parties do not dispute that this subdivision had to be consistent with the Act's purposes with respect to both historic districts and historic landmarks, and so we operate under that assumption as well.

the Temple itself. The Mayor's Agent further noted that the smaller lots resulting from this subdivision would be more similar in size to other lots in the surrounding historic districts and that the district's character would be improved by allowing for construction in an incongruous gap in the neighborhood's cityscape. Taken together, these findings are sufficient to justify its decision to approve Perseus's application.

Attempting to show otherwise, DECAA's petition advances a number of arguments, which generally fall into seven categories. First, and most broadly, it claims that the balancing test used by the Mayor's Agent is inconsistent with the plain text of the Preservation Act. Specifically, it highlights the statute's use of the conjunction "and" when articulating its various purposes vis-à-vis historic landmarks and districts. As a result of this conjunctive language, DECAA maintains, a subdivision is only "necessary in the public interest" if it advances each and every one of these stated purposes—simultaneously retaining *and* enhancing *and* adapting for current use *and* restoring a landmark—regardless of any net historic-preservation benefits. Applying this theory, DECAA argues that the Mayor's Agent's decision was unsupported by substantial evidence, because there was nothing in the record to support a finding that the subdivision would specifically "enhance" the Temple landmark or encourage its "adaptation for current use."

But this "conjunctive theory" requires an untenable reading of the statutory text, and it is one we have already rejected. *FOMP II*, 207 A.3d at 1166 (requiring "net" assessment of project's effects). The statute merely requires that a subdivision of a historic landmark be "consistent with" these enumerated purposes. D.C. Code § 6-1102(10). DECAA is therefore mistaken to read this provision as requiring that a subdivision materially advance or promote each of these purposes in a specific, articulable way. To the contrary: "consistent" means that something "show[s] no noteworthy opposing, conflicting, inharmonious, or contradictory qualities or trends; compatible." Consistent, *Webster's Third New International Dictionary* 484 (2002). Thus, the Mayor's Agent may reasonably conclude that a subdivision is consistent with the purposes of the Preservation Act so long as it is compatible with its purposes—i.e., it does not interfere with or otherwise undermine them. There was no need for a finding that subdividing Lot 108 would specifically enhance the Temple landmark or encourage its adaptation. It was enough that the project did not cut against any of the statutory purposes and, on net, advanced those purposes collectively.

DECAA counters that this reading of the statute is inconsistent with this court's decision in *Gondelman v. D.C. Dep't of Consumer & Regul. Affs.*, 789 A.2d 1238 (D.C. 2002), but we disagree. That case involved an application to undertake

significant alterations to a house located in a historic district, including constructing a garage on the property and "pav[ing] a portion of the front yard." *Id.* at 1239. As DECAA correctly notes, our opinion stated that while this project would adapt the property for current use, the applicant had failed to demonstrate "that the proposed alterations will retain and enhance the historic property" while also being "compatible with the character of the historic district." *Id.* at 1246. But this statement must be read in the context of the facts of that case, where the Mayor's Agent found that the project not only failed to advance these statutory goals, but in fact directly undermined them by "reduc[ing] the green space which is an integral part of" the historic district. *Id.* at 1243. In other words, *Gondelman* addressed an entirely different question than the one raised by this case, where the Mayor's Agent found that Perseus's proposed subdivision was "consistent with" each of the Preservation Act's purposes, even if it did not specifically advance each of them.

Second, DECAA argues that the Mayor's Agent erred by relying on "economic considerations"—namely, the fact that the subdivision of Lot 108 and resulting revenue generated by the apartment project would fund renovations to the Temple landmark. But again, its argument is largely premised on a misreading of our precedent. Specifically, DECAA points to *D.C. Preservation League v. Dep't of Consumer & Regul. Affs.*, 646 A.2d 984 (D.C. 1994), for the proposition that the

Mayor's Agent may not "take[] into account such factors as the cost of refurbishing the dilapidated structure." *Id.* at 990. In context, however, that statement refers to an application to demolish a historic property *solely* on the grounds that the property would be too expensive to renovate. *Id.* at 990-91. We reversed the Mayor's Agent's decision approving the application, opining that "[t]he relative cost of refurbishing an existing structure . . . is an extraneous factor" unrelated to any of the Preservation Act's purposes. *Id.* That is markedly different than the question presented in this case, where the Mayor's Agent's "economic consideration"—i.e., a revenue source for the Temple renovation—did advance those historic-preservation purposes. *Preservation League* did not hold that the Mayor's Agent is categorically barred from considering that, and DECAA's contrary arguments are not supported by the statute's text or our precedents.[6]

---

[6] DECAA also repeatedly alleges that the Masons misled the Mayor's Agent regarding the need for this revenue source, pointing to extra-record evidence supposedly showing that renovations to the Temple have already been substantially undertaken, before there could be any revenue stream from the anticipated apartment building. But our review in administrative appeals is strictly limited to the "exclusive record for decision before the . . . agency." D.C. Code § 2-510(a); *accord Union Mkt. Neighbors v. D.C. Zoning Comm'n*, 197 A.3d 1063, 1068 n.4 (D.C. 2018). And, in any event, that the Masons have undertaken some renovations to the Temple is not inconsistent with a finding that more restoration work is needed for this century-old structure, or that the Masons might have only been able to undertake these initial repairs because they could anticipate a revenue stream from the construction project.

Third, and relatedly, DECAA argues that if the Mayor's Agent was permitted to consider the "downstream effects" of the subdivision (he was), his decision was arbitrary and capricious because he failed to also consider the negative aesthetic effects of "dropping a massive 65 foot tall building" next to a historic landmark. We disagree. Remember that the Mayor's Agent's decision granted only the subdivision of Lot 108; it did not approve any particular use of, or construction on, the subdivided land. As the Mayor's Agent correctly noted in his decision, the supposed negative effects invoked by DECAA—principally obscuring sightlines to the Temple's rear façade—all stem from its views about the developer's design choices, which were outside the scope of the Mayor's Agent's review. *See FOMP I*, 149 A.3d at 1040 (the Mayor's Agent may not "function essentially as a second Zoning Commission, evaluating all of the benefits and adverse impacts associated with projects requiring a permit from the Mayor's Agent"). Conversely, any development project, no matter how designed, would result in a revenue stream for Temple renovations that was credited in the Mayor's Agent's analysis. There was nothing arbitrary and capricious about factoring the potential for revenue generation into its decision while discounting DECAA's arguments about the design of the project.

Fourth, DECAA challenges the finding that the eastern portion of Lot 108 did not contribute to the Temple landmark's historic significance. But as we held in Part

II, the eastern portion of the property is not part of the Temple landmark, and HPRB's finding on this point was both reasonable and supported by substantial evidence. To the extent DECAA believes that the eastern portion of the lot, even if not formally part of the landmark, nonetheless contributes to the structure's historic significance as a result of its "close[] associat[ion]" with the Temple, its arguments merely invite us to consider anew the same evidence that was before the Mayor's Agent, which we decline to do. *See Cathedral Park Condo. Comm. v. D.C. Zoning Comm'n*, 743 A.2d 1231, 1247 (D.C. 2000) ("It is not our role to reweigh the evidence in the record in reviewing an agency decision.").

Fifth, DECAA argues that the Mayor's Agent erred by focusing "myopically" on just two factors—lot size, and the presently undeveloped land's fit with the surrounding neighborhood—in his analysis of the subdivision's congruity with the surrounding historic districts. But again, the supposedly overlooked factors it points to are not byproducts of the subdivision itself, but instead all stem from DECAA's views about the apartment building's design. For example, DECAA claims that "[a] massive 65 foot tall building along S Street will destroy the character of these Historic Districts," that it will "loom[]" over nearby houses, and that unlike other neighboring structures, it was designed with "a 15 foot deep 5 foot wide trench in front." As just explained, these aesthetic considerations are governed by the

District's zoning laws and are beyond the scope of the Mayor's Agent's review. The only question before the Mayor's Agent in this case was whether the subdivision itself, i.e., the splitting of Lot 108 into two smaller lots, was "compatible with the character of this historic district." D.C. Code § 6-1101(b)(1). DECAA points to no factors relevant to this inquiry that were overlooked.

Sixth, DECAA takes aim at one of the findings in the Mayor's Agent's historic district compatibility analysis: that "the current character of the eastern portion of the property—a vacant, open space—is incompatible with the historic district." This, DECAA contends, is inconsistent with prior decisions that have sought to protect open space within historic districts, as well as the fact that other historic districts are centered around open spaces (e.g., Dupont Circle). We see no inconsistency. The question before the Mayor's Agent was not whether open space is compatible with historic districts in general; it was whether *this* open space was compatible with *these* districts in particular (i.e., the 14th and 16th Street Historic Districts). The Mayor's Agent, noting that the eastern portion of Lot 108 was occupied by buildings until the early 1990s, concluded that it was not. And contrary to DECAA's arguments, its findings on this point were supported by substantial evidence.

Finally, DECAA argues that the subdivision would undermine the purposes of the Preservation Act by "sever[ing] the Carriage House from the Temple, with which it has been closely historically associated for almost [one] hundred years." But as discussed in Part II, the carriage house is not a part of the Temple landmark; indeed, the Masons only acquired it in the late 1960s, decades after the Temple's period of historic significance. As such, the Mayor's Agent reasonably found that there would be no historic-preservation loss if the two structures were located on two different record lots.

## IV.

For the foregoing reasons, in case number 22-CV-0884, we reverse the Superior Court's order granting summary judgment to DECAA and remand for entry of judgment in the District's favor. In case number 20-AA-693, we affirm the Mayor's Agent's order approving the Lot 108 subdivision.

*So ordered.*